STUART, Justice.
These consolidated appeals stem from the death of four-year-old Nevaeh Johnson in a fire that destroyed her family’s mobile home in May 2011. Following Nevaeh’s death, Nevaeh’s mother, Latosha Hosford (“Latosha”); Latosha’s husband, Chad Barley (“Barley”); and Nevaeh’s grandmother, Rhonda Hosford (“Hosford”), sued BRK Brands, Inc. (“BRK”), the manufacturer of two smoke alarms in the mobile home at the time of the fire, and other defendants' in the Conecuh Circuit Court asserting various claims stemming from the fire.[1] In appeal no. 1140899, Latosha appeals the judgment as a matter of law entered on her failure-to-warn, negligence, *201 and wantonness claims, as well as a judgment entered on the jury’s verdict following the trial of her products-liability claim asserted under the Alabama Extended Manufacturer’s Liability Doctrine (“AEMLD”). In appeal no. 1140901, Lato-sha and Hosford, as co-administratrixes of Nevaeh’s estate, appeal the judgment as a matter of law entered on their breach-of-warranty claim seeking compensatory damages on behalf of Nevaeh for pain and mental anguish she allegedly-suffered before her death. We affirm the challenged' judgments in both appeals.
I.
On the night of May 20, 2011, a mobile home Latosha and Barley were renting in Castleberry was destroyed by a fire that began in a faulty electrical outlet in Ne-vaeh’s bedroom. At some point after the fire began, Latosha and Barley were awakened by one of the two smoke alarms Barley had installed in the mobile home. They were able to escape with their nine-month-old son, who was- sleeping in their bedroom; however,-they-were unable to rescue Nevaeh, and she perished in the fire. Subsequently, Latosha, ■ Barley, and Hosford sued BRK.[2] The gravamen of their claims against BRK was that the two BRK smoke alarms that had been installed in the mobile home were defective and unreasonably dangerous by design inasmuch as those smoke alarms relied solely on ionization technology, which, the plaintiffs alleged, fails to give adequate warning to allow an escape in the event of a slow smoldering fire, as opposed to a faster flaming fire. In connection with this theory, the plaintiffs specifically asserted breach-of-warranty, failure-to-warn, negligence, wantonness, and AEMLD claims.[3]
After discovery, BRK moved for a summary judgment in its favor on the plain *202 tiffs’ claims. The trial court eventually granted BRK’s motion in part and entered separate judgments as a matter, of law in favor of BRK on Latosha and Hosford’s breach-of-warranty claim and on the claims asserted by Latosha and Barley in their individual capacities. However, the trial court allowed the remainder of the claims, all of which had been asserted by Latosha in her role as Nevaeh’s mother, to proceed to a February 2015 trial.
After Latosha completed the presentation of her case at trial, BRK moved for a judgment as a matter of law. The trial court granted the motion and entered a judgment in favor of BRK with respect to every claim except the AEMLD claim. BRK then presented its defense, and, after the trial court denied BRK’s renewed motion for a judgment as a matter of law at the close of all the evidence, the AEMLD claim was submitted to the jury. On March 11, 2015, the jury returned a verdict in favor of BRK and against Latosha; the trial court thereafter entered a judgment in favor of BRK consistent with that verdict. Latosha’s subsequent post-judgment motion seeking to vacate that judgment and requesting a new trial was denied, and the plaintiffs thereafter filed three appeals challenging the various judgments entered by the trial court. Latosha and Barley subsequently voluntarily dismissed their appeal of the summary judgment entered on their individual personal-injury claims, and appeals no. 1140899 and 1140901 were thereafter consolidated for the purpose of writing one opinion.
II.
Latosha and Hosford seek the reversal of three judgments entered by-the trial court. In appeal no. 1140899, Latosha seeks the reversal of (1) the judgment as a matter of law entered in favor of BRK midtrial on her failure-to-warn, negligence, and y/antonness claims and (2) the judgment entered on the jury’s -verdict in favor of BRK on her AEMLD claim. In appeal no. 1140901, Latosha and Hosford seek the reversal of the summary judgment entered on the breach-of-warranty claim asserted on behalf of-Nevaeh. Latosha and Hos-ford agree with BRK, however, that if the judgment on the AEMLD claim is affirmed,- it is unnecessary for this Court to consider their arguments regarding the other judgments. See Latosha and Hos-ford’s brief, p. 74 (“If this Court reverses the jury’s defense verdict ..., the summary judgment granted on plaintiffs’ breach-of-warranty claim, and the [judgment as a matter of law] granted on plaintiffs’ failure-to-warn, negligence, and wantonness claims, will be ripe for review.”). This concession is apparently based on their belief that the jury, in returning a verdict in favor of BRK on the' AEMLD claim, necessarily made some findings of fact that would also mandate a judgment iñ favor of BRK on the other' asserted claims. See, e.g., McMahon v. Yamaha Motor Corp., U.S.A., 95 So,3d 769, 772-73 (Ala.2012) (explaining -that a jury’s verdict in favor of a manufacturer on an AEMLD claim would have required a similar verdict in favor of the manufacturer on a negligence claim if such a claim had been submitted to the jury). Accordingly, we first consider the parties’ arguments regarding the AEMLD claim because our resolution of those arguments could obviate the need to consider the issues ’surrounding the other claims.
Latosha argues that the judgment in favor of BRK on the AEMLD claim should be reversed and the cause remanded for a new trial based on errors allegedly made by the trial court in (1) excluding certain evidence and testimony that she sought to introduce at trial and (2) giving the jury certain jury charges *203 requested by BRK that, she claims, were erroneous and prejudicial. BRK argues that the trial court correctly excluded the evidence and testimony identified by Lato-sha and properly instructed the jury; however, it also argues that it .is unnecessary for this Court to even consider those issues because, it argues, it was entitled to a judgment as a matter of law on Latosha’s AEMLD claim. See Williams v. BIC Corp., 771 So.2d 441, 445 (Ala.2000) (considering appellee’s argument that the trial court erred by denying the appellee’s motion for a judgment as a matter of law before considering appellant’s argument that the jury was given erroneous instructions). Thus, we first consider whether the trial court erred by failing to grant BRK’s motion for a judgment as a matter of law on Latosha’s AEMLD claim.
“When reviewing a ruling on a motion for a [judgment as a matter of law], this Court uses the same standard the trial court used initially in deciding whether to grant or deny the motion for a [judgment as a matter of law]. Palm Harbor Homes, Inc. v. Crawford, 689 So.2d 3 (Ala.1997). Regarding questions of fact, the ultimate question is whether -the nonmovant has presented sufficient evidence to allow the casé to be submitted to the jury for a factual resolution. Carter v. Henderson, 598 So.2d 1350 (Ala.1992). The nonmovant must have presented substantial evidence in order to withstand a motion for a [judgment as a matter of law]. See § 12-21-12, Ala. Code 1975; West v. Founders Life Assurance Co. of Florida, 647 So.2d 870, 871 (Ala.1989). A reviewing court must determine whether the party who bears the burden of proof has produced substantial evidence creating a factual dispute requiring resolution by the jury. Carter, 598 So,2d at 1353. In reviewing a ruling on a motion for a [judgment as a matter of law], this Court views.the evidence in the light most favorable to the nonmovant and entertains such reasonable inferences as the jury would have been free to draw. Id.”
Waddell & Reed, Inc. v. United Investors Life Ins. Co., 875 So.2d 1143, 1152 (Ala.2003). With regard to an AEMLD claim, this Court has explained that a plaintiff pursuing such a claim must establish that the product alleged to have caused an injury “is sufficiently unsafe so as to render it defective”; that fact must be established “by proving that a safer, practical, alternative design was available to the manufacturer at the time it manufactured the allegedly defective product,” McMahon, 95 So.3d at 772. The existence of a safer, practical, alternative design may, in turn, be' established by showing (1) that the injuries inflicted by the product would have been less severe or eliminated by the use of the alternative design and (2) that the utility of the alternative design outweighed the utility of the design actually used.[4] General Motors Corp. v, Jernigan, 883 So.2d 646, 662 (Ala.2003). Thus, when the standard of review set forth in Waddell & Reed is applied to Latosha’s AEMLD claim, Latosha, in order to survive BRK’s motion for a judgment as a matter of law at the close of her case, was required to put forth substantial evidence identifying a safer, practical, alternative design BRK could have used for the ionization smoke *204 alarms purchased by Barley; that is, Lato-sha had to present substantial evidence indicating that the proposed alternative design would have resulted in Nevaeh’s escaping from the fire and substantial evidence indicating that the utility of the proposed alternative design outweighed the utility of the design actually used by BRK.
The theory of Latosha’s case was that ionization smoke alarms like the ones manufactured by BRK and purchased and installed in the mobile home by Barley are defective and unreasonably dangerous because, she said, they can fail to provide adequate warning time for an individual to escape from a fire that begins as a slow, smoldering fire. It appears to be undisputed that smoke alarms using photoelectric technology are generally more sensitive to smoke originating from such smoldering fires; however, photoelectric technology is, in turn, generally considered to be less sensitive to smoke coming from flaming fires. Latosha accordingly argues that a safer, practical, alternative to an ionization smoke alarm is a dual-sensor smoke alarm incorporating both ionization and photoelectric technology. BRK in fact manufactures such dual-sensor smoke alarms; however, they are generally more expensive than alarms relying solely on one technology.[5] For this and other reasons, BRK argues that a dual-sensor smoke alarm should not be considered a safer, practical, alternative design to an ionization smoke alarm; rather, BRK argues, the two are entirely different products. Accordingly, BRK argues, it was entitled to a judgment as a matter of law on Latosha’s AEMLD claim because, it argues, Latosha did not submit any evidence identifying a safer, practical, alternative design for an ionization smoke alarm. As BRK argues in its brief to this Court:
“In any event, as a matter of law, a dual-sensor alarm is not a safer practical alternative of a single-sensor ionization (or photoelectric) smoke alarm. The proposed alternative cannot be a different product. Hines v. Wyeth (No. CIV.A. 2:04-0690, May 28, 2011) (S.D.W.Va.2011) (not reported in F.Supp.) (‘an alternative design is not reasonable if it alters a fundamental and necessary characteristic of the product’). While smoke alarms, dual-sensor alarms have enhanced features, containing not only two sensors, but also redundant circuitry, [but] at significantly higher cost. The number of sensors is a fundamental and necessary characteristic of each type of alarm.
[[Image here]]
“More importantly, within the context of claims challenging a product’s performance, consumers selecting a model smoke alarm at a cost reflecting the features provided should not be able to argue that the smoke alarm manufacturer should have included additional features. Recognizing a dual alarm as a potential alternative design creates the same risk of imposing unlimited liability upon manufacturers unless they produce only smoke alarms with every conceivable enhanced feature. Exposing manufacturers to liability unless they produce smoke alarms with all of these features risks driving the costs of this life saving product beyond the financial means of a significant segment of the population.”
BRK’s brief, pp. 54-56.
Latosha counters by arguing that the fundamental purpose of any residential *205 smoke alarm—regardless of the technology it is based on—is to detect smoke 'and to provide a warning so that occupants of the residence can escape safely and that any residential smoke alarm can reasonably be considered an alternative to another, regardless of the specific technology used to detect that smoke. Furthermore, Latosha argues, even the case cited by BRK indicates that “the reasonableness of an alternative design is generally a question of fact for the jury” Hines v. Wyeth (No. CIV.A. 2:04-0690, May 23, 2011) (S.D.W.Va.2011) (not reported in F.Supp.) (emphasis added). Accordingly, Latosha argues, the judgment entered on the jury’s verdict in favor of BRK on her AEMLD claim should not be affirmed on the basis that she failed to introduce evidence of a safer, practical, alternative to the BRK ionization smoke alarms installed by Barley in their mobile home.
Although the parties have not identified any Alabama caselaw specifically discussing whether a proposed alternative design in an AEMLD case is sufficiently similar to the allegedly defective product to be considered an actual alternative design, we agree with the' principle set forth in Hines that “the reasonableness of an alternative design is generally a question of fact for the jury.” However, as made implicit by the use of the term “generally,” there are necessarily some circumstances where a court can appropriately hold as a matter of law that a proposed alternative design is sufficiently different from the allegedly defective product that it is more properly viewed as a design for a different product than as an alternative design of the allegedly defective product. As’ we explain below, this is such a case.
In Brockert v. Wyeth Pharmaceuticals, Inc., 287 S.W.3d 760, 762 (Tex.App.2009), a Texas Court of Appeals considered an appeal brought by an individual who had been prescribed the drug Prempro, a combination of estrogen and progestin, to treat menopausal symptoms. The appellant subsequently asserted that Prempro had caused her to develop breast cancer. In conjunction with her argument that Prem-pro was a defective product, the appellant alleged that estrogen alone was a safer alternative product. The drug manufacturer, however, asserted that estrogen was not an alternative design for Prempro; rather, it argued, estrogen was a different drug entirely—-which the defendant drug manufacturer also manufactured and marketed as Premarin.
In concluding as a- matter of law that Premarin was not an alternative design for Prempro, the Texas Court of Appeals explained:
“A design defect renders a product unreasonably dangerous as designed, taking into consideration the utility of the product and the risk involved in its use. Gen. Motors Corp. v. Sanchez, 997 S.W.2d 584, 588 (Tex.1999). A plaintiff must prove that there is a safer alternative design to recover under a design-defect theory. Id,; Caterpillar, Inc. v. Shears, 911 S.W.2d 379, 384 (Tex.1995). In the absence of a safer alternative, a product is not unreasonably dangerous as a matter of law. Caterpillar, 911 S.W.2d at 384.
“[The appellant] argues that she has presented substantial evidence of a safer alternative design. Specifically, she contends that the safer alternative design to estrogen in combination with progestin is estrogen alone. As [the appellant] acknowledgés, this alleged alternative design already exists in prescription drugs like Premarin, .also made by Wyeth. ... Wyeth responds that Pre-marin (estrogen only) is not an alternative design for Prempro (estrogen with progestin), but instead is a completely *206 different prescription drug intended for a different population of women.
[[Image here]]
“The Texas Supreme Court has held that a plaintiff cannot prove design defect by claiming that defendant should have sold an entirely different product. See Caterpillar, 911 S.W.2d at 384-85. In Caterpillar, the allegedly defective product was a front-end loader with a rollover-protective structure CROPS’) that was removable, which allowed the loader to be used in low-clearance areas. The plaintiffs design-defect expert testified that the froni>end loader should have been configured so that the ROPS was not removable or so that the removal of the ROPS would render the loader inoperable. The supreme court reversed a jury verdict of, design defect, holding that this was ‘no evidence ... of a safer alternative design for a front-end loader that could fulfill the multi-pur-pose role of Caterpillar’s model 920 with a removable ROPS.’ Id. at 384. The court rejected the plaintiffs argument that the defendant should have changed the product in such a way that it was essentially transformed into a different product:
“‘A motorcycle could be made safer by adding two additional wheels and a cab, but then it is no longer a motorcycle. A convertible can be made safer by fully enclosing the cab, but then it is just an ordinary car. The law of products liability demands that manufacturers and distributors take feasible steps to make their products reasonably safe. It is not rational, however, to impose liability in such a way as to eliminate whole categories of useful products from the market.’
“Id. at 385; see also Am. Tobacco Co., Inc. v. Grinnell, 951 S.W.2d 420, 433 & n. 10 (Tex.1997) (granting summary judgment to defendant because there was no safer alternative design for cigarettes; ‘[cjategorical liability is not only an unworkable solution, but also a position repeatedly rejected by courts.’).
“The [United States Court of Appeals for the] Fifth Circuit has also found that a plaintiff cannot prove that a safer alternative design exists by pointing to a substantially different product, even when the other product has the same general purpose as the allegedly defective product. See Theriot v. Danek Med., Inc., 168 F.3d 253 (5th Cir.1999) (applying Louisiana law). In Theriot, the court held that a plaintiff who contended that pedicle screws were defectively designed was required to demonstrate a safer alternative design that involved pedicle screws, and that the plaintiff was not permitted to point to other products intended to provide biomechanical stability, such as internal systems using hooks or wires, or external neck braces. Id. at 255.
“Thus, a safer alternative design must be one for the product at issue—here, Prempro.... [The appellant] does not explain how Prempro could have been modified or improved; she instead argues that progestin should not have been added to. estrogen. In essence, [the appellant] argues that the product Prempro should have been a different product: its predecessor Premarin. But, as the [Texas] supreme court has explained, Texas law does not recognize this sort of categorical attack on a product. See Caterpillar, 911 S.W.2d at 384-85.”
287’ S.W.3d at 769-71. Thus, even though Prempro, the allegedly defective product, and Premarin, the proposed alternative product, had essentially the same purpose—to treat menopausal symptoms—the Brockert court held as a matter of law that *207 one was not a safer alternative to the other because they were, different, products. La-tosha’s position in this case is effectively the same as that of the appellant in Broc-kert—both argued that a product was defective and, as evidence of that fact, identified as a safer alternative another product manufactured by the same manufacturer that allegedly had sold the defective product. Consistent with the rationale of the Brockert court, we now hold as a matter of law that the dual-sensor smoke-alarm design put forth by Latosha is not, in fact, a safer, practical, alternative design to an ionization smoke alarm; rather, it is a design for a different product altogether.
As the Supreme Court of Texas explained in Caterpillar, Inc. v. Shears, 911 S.W.2d 379, 385 (Tex.1995): “It is not rational ... to impose liability in such a way as to eliminate whole categories of useful products from the market.” As even La-tosha’s smoke-alarm expert witness acknowledged, ionization smoke alarms, can and do save lives, including, in this case, the lives of Latosha, Barley, and their son. Although Latosha argues that a dual-sensor smoke alarm might have saved Ne-vaeh’s life as well, Barley’s testimony regarding whether he could have afforded the higher cost of such an alarm was mixed, and there is at least the possibility that the total absence of less expensive ionization smoke alarms from the market would have resulted in no smoke alarm being present in their mobile home at the time of the fire and, consequently, three additional deaths. In Linegar v. Armour of America, Inc., 909 F.2d 1150 (8th Cir. 1990), the United States Court of Appeals for the Eighth Circuit reversed a judgment entered on a jury’s verdict finding that a certain model of bulletproof vest was defective because it failed to provide as much coverage under the arms as other bulletproof vests on the market, and its discussion of the trade-offs associated with the purchase of safety devices is applicable in this case as well:
“A manufacturer is not obliged to market only one version of a product, that being the very safest design possible. If that were so, automobile manufacturers could not offer consumers sports cars, convertibles, jeeps, or compact cars. All boaters would have to buy full life vests instead of choosing a ski belt or even a flotation cushion. Personal safety devices, in particular, require personal choices, and it is beyond the province of eourts and juries to act as legislators and preordain those choices.
“In this case, there obviously were trade-offs to be made. A contour vest like the one here in question permits the wearer more flexibility and mobility and allows better heat dissipation and sweat evaporation, and thus is more likely to be worn than a more confining vest.. It is less expensive than styles of vests providing more complete coverage. If manufacturers like Armour are threatened with economically devastating litigation if they market any vest style except that offering maximum coverage, they may decide, since one can always argue that more coverage is. possible, to get out of the business altogether. Or they may continue to market the vest style that, according to the latest lawsuit, affords the ‘best’ coverage. Officers who find the ‘safest’ style confining or uncomfortable will either wear it at risk to their mobility or opt not to wear it at all.... Law enforcement' agencies trying to work within the confines of a budget may be forced to purchase fewer vests or none at all. How ‘safe’ are those possibilities? ‘The core concern in strict tort liability law is safety.’ Nesselrode [v. Executive Beechcraft, Inc.], 707 S.W.2d [371,] 375. [(Mo.1986)]. We are firmly convinced that to allow this *208 verdict to stand would run counter to the law’s purpose of promoting the development of safe and useful products, and would have an especially pernicious effect on the development and marketing of equipment designed to make the always-dangerous work of law enforcement officers a little safer.”
909 F.2d at 1154-55.
Having concluded that ionization smoke alarms and dual-sensor smoke alarms are different products, we must also hold that BRK was entitled to a judgment as a matter of law on Latosha’s AEMLD claim. Latosha concedes that she submitted no evidence indicating that there was a safer, practical, alternative design for an ionization smoke alarm; indeed, the theory of her case was that it was impossible to have a safe ionization smoke alarm. Because a plaintiff asserting an AEMLD claim cannot prevail in the absence of evidence establishing the existence of a safer, practical, alternative design for the allegedly defective product—not a design for a different, albeit similar, product, even if it serves the same purpose—the judgment entered in favor of BRK on Latosha’s AEMLD claim is affirmed. See Jernigan, 883 So.2d at 662 (stating that a plaintiff in an AEMLD case must prove that a safer alternative design was available to the manufacturer), Brockert, 287 S.W.3d at 770 (noting that “a safer alternative design must be one for the product at issue” (emphasis added)), and Theriot v. Danek Med., Inc., 168 F.3d 253, 255 (5th Cir.1999) (stating that a plaintiff cannot prove a safer alternative design by identifying a different product even if that product has the same general purpose as the challenged product).
III.
The plaintiffs sued BRK after Nevaeh was killed in a fire at their mobile home, alleging that BRK was responsible for her death inasmuch as a BRK-manufactured ionization smoke alarm allegedly did not respond to smoke' caused by the fire and sound an alarm in time to allow Nevaeh to escape. Before trial and after Latosha presented her case-in-chief, the trial court entered judgments as' a matter of law in favor of BRK on the plaintiffs’ breach-of-warranty, failure-to-warn, negligence, and wantonness claims. Latosha’s AEMLD claim was submitted to the jury, however, and the jury ultimately returned a verdict in favor of BRK. After the trial court entered a final judgment consistent with that verdict, Latosha and Hosford appealed the various judgments entered against them to this Court. We now hold that the judgment entered on the jury’s verdict in favor of BRK on Latosha’s AEMLD claim is due to be affirmed inasmuch as Latosha did not submit evidence identifying a safer, practical, alternative design that BRK cpuld have used for the ionization smoke alarms purchased by Barley for use in the mobile home; accordingly, BRK was entitled to a judgment as a matter of law on that claim. Inasmuch as Latosha and Hosford have conceded that we need not consider any of the other judgments entered by the trial court if the judgment entered on the AEMLD claim is affirmed, we affirm those other judgments as well.
1140899—AFFIRMED.
1140901—AFFIRMED.
PARKER, SHAW, WISE, and BRYAN, JJ., concur.

. Latosha and Barley were living together and were engaged to be married at the time of the fire and when this action was initiated; they were married before the case came to trial. Accordingly, Latosha is referred to in the record as both "Latosha Hosford” and "Latosha Barley.” For consistency and to differentiate between her, Barley, and Hos-ford, we refer to her in this opinion as "Lato-sha.”

. Latosha, Barley, and Hosford also named other defendants, including the property owner, in their action; however, the claims against the other defendants were resolved before trial and are not relevant to these appeals.

. Those claims included claims seeking damages for the death of Nevaeh and damages on her behalf and claims asserted by Latosha and Barley in their individual capacities. However, although the plaintiffs’ complaint asserted several claims against BRK based on Nevaeh’s death, those claims are effectively just variations of' a single wrongful-death claim. As this Court explained in Sledge v. IC Corp., 47 So.3d 243, 247 (Ala.2010):
"The complaint alleges several different counts against [the defendants], including products liability (count VIII), negligence and/or wanton conduct (count IX), violation of the AEMLD- (count X), and breach of warranty (count XI). However, those counts are not separate claims. Instead, [the plaintiff] can maintain an action against [the defendants] only under § 6-5-410, Ala.Code 1975, for wrongful death, which she specifically alleged in count XV of the complaint. Alabama Power Co. v. White, 377 So.2d 930, 933 (Ala.1979) (‘[I]n Alabama there is but one cause of action for wrongful death, i.e., [Ala.] Code 1975, § .6-5-410.’); see also Carter v. City of Birmingham, 444 So.2d 373, 375 (Ala.1983) (noting that under Alabama law only a wrongful death action may be maintained, and only punitive damages are recoverable’). Counts VIII through XI in this .case cannot be maintained by [the plaintiff] outside a wrongful-death action under § 6-5-410, Ala.Code 1975; instead, those counts are ‘ "mere variations of legal theory” ’ underlying [the plaintiff’s] single wrongful-death claim, Scrushy [v. Tucker, 955 So.2d 988, 996 (Ala.2006)] (quoting Stearns v. Consolidated Mgmt., Inc., 747 F.2d 1105, 1109 (7th Cir.1984)), and [the plaintiff] can recover only one set of damages for all. Trott v. Brinks, Inc., 972 So.2d 81, 84 (Ala.2007) (noting that, in a wrongful-death action, ‘the only recoverable damages are punitive damages’),”
Nevertheless, inasmuch as the parties refer to the different counts based on Nevaeh’s death as "claims,” we at times do the same in this opinion.

. Factors to be considered when determining whether the utility of the alternative design outweighed the utility of the design actually used include: the intended use of the product; its styling, cost, and desirability; its safety features; the foreseeability of the accident that occurred, along with the likelihood of injury and the seriousness of injury that would result from such an accident; the obviousness of the defect; and the manufacturer’s ability to eliminate the defect. General Motors Corp. v. Jernigan, 883 So.2d 646, 662 (Ala.2003).

. Latosha’s smoke-alarm expert, Don Russell, testified that at the time of trial BRK-manufactured ionization or photoelectric smoke alarms could be purchased at Wal-Mart discount stores for approximately. $13 each, while a dual-sensor smoke alarm could be purchased "for just under [$20].”