[DO NOT PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 23-10050

_____

AUSTIN J. RAPPUHN,

Plaintiff-Appellant,

*versus*

PRIMAL VANTAGE COMPANY, INC.,

Defendant- Appellee,

_____

Appeal from the United States District Court
for the Southern District of Alabama
D.C. Docket No. 1:20-cv-00528-CG-N

_____

Before WILLIAM PRYOR, Chief Judge, and JORDAN and BRASHER, Circuit Judges.

PER CURIAM:

This appeal requires us to decide whether the district court abused its discretion when it limited the opinions of two of Austin Rappuhn's expert witnesses and whether it erroneously granted summary judgment to Primal Vantage Company, Inc. The district court granted summary judgment by saying that there was no genuine dispute of material fact as to the alleged violation of the Alabama Extended Manufacturer's Liability Doctrine, negligence, and wantonness after excluding key portions of the experts' testimony. But the district court misunderstood the experts' testimony and weighed its persuasiveness in determining its admissibility, which are not valid bases for excluding expert testimony. The district court didn't perform a proper expert analysis under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and this error infected the summary judgment decision. The district court also incorrectly reasoned that the possibility of user error with an alternative design means that Rappuhn must lose. We reverse the district court's grant of summary judgment and its expert testimony exclusions and remand for further proceedings consistent with this opinion.

## I.

Austin Rappuhn went on a deer hunting trip with his father in November 2018. Rappuhn brought a tree stand—the PVCS-400, which was designed, manufactured, produced, and distributed by

Primal Vantage. The PVCS-400 is a climbing tree stand: a hunter uses the tree stand to scale up the trunk of a tree until he reaches the height from which he wishes to hunt. The PVCS-400 has a seat and a foot platform, which are secured to the tree with cables that wrap around the trunk and attach to the tree stand with fasteners called Quickclips. A Quickclip is an open-ended latch that fits over an open-ended pin.

Rappuhn and his father split up and each found a tree from which to hunt. Rappuhn set up his PVCS-400, which he had done several times before, and began to climb a tree. As he was scaling the tree, he heard a popping sound and felt something break free. He fell to the ground from a height of around seven feet. Rappuhn lost consciousness when he fell; and upon regaining consciousness, he found himself face down in the mud, with the seat platform of the PVCS-400 wrapped around him. He couldn't move and called for his father's help. When his father got to him, he called 911. His father noticed that the foot platform of the PVCS-400 was still attached to the tree. He also found one of the Quickclips on the ground nearby and saw that the top platform's securement cable had come out of the frame on the right side of the tree stand. Rappuhn went to the hospital, where he learned that he was permanently paralyzed from the chest down.

Rappuhn sued Primal Vantage in federal court and alleged a violation of the Alabama Extended Manufacturer's Liability Doctrine, negligence, and wantonness. He alleges that the PVCS-400's Quickclip disengaged while he was climbing the tree and that

Primal Vantage should have used a safer way to secure the cables that hold the tree stand to the tree. To support this theory, Rappuhn presented the testimony of two expert witnesses: Guy Avellon, a fastener expert, and Dr. Jahan Rasty, a mechanical engineering expert.

Avellon, as an expert on fasteners, investigated the different design options for tree stand fasteners and their relative safety and utility. Avellon opined in a report that the Quickclip is a relatively unsafe fastener choice for a tree stand because the pin is too long and not tight to the frame, the stiffness of the latch spring is variable, and the open-ended design makes the Quickclip capable of disengaging. Avellon opined in a report that safer fastener designs like a nut-and-bolt design were feasible, practical, and readily available when the PVCS-400 was manufactured and sold. Avellon explained that these alternative designs are safer because they have a tighter fit than a Quickclip; do not have an open-ended design that can cause false-latch scenarios; and must be screwed in, preventing unexpected disengagement while in use. Avellon's expert report also explained that "[a]s designed, there are no mechanical means or warnings provided to assure the Quick Clip is properly fastened before a user begins to ascend a tree." And it similarly stated that there are not "physical means" to ensure the cable is "locked in position." Later, in his deposition testimony, Avellon testified that a user could "visually" detect whether a Quickclip was "properly closed" by looking at it.

Rasty, as an expert on mechanical engineering, investigated what may have caused the PVCS-400 to detach from the tree for Rappuhn to have fallen. Rasty concluded in a report that the tree stand most likely detached because a Quickclip disengaged under a false-latch scenario. Rasty explained that a Quickclip may appear fastened when it is not and thus can disengage when the tree stand's user is climbing the tree. Rasty performed tests to evaluate this theory. Although he didn't perform any tests with a heavy load on the tree stand, he explained that the presence of a heavy load on the tree stand wouldn't change his test results or conclusion. Specifically, he said that any load would be perpendicular to the force he was testing and would make a minimal difference in the likelihood of the tree stand coming unlatched.

Primal Vantage moved to exclude or limit these experts' testimony and for summary judgment. The district court agreed with Primal Vantage and decided that it would not consider Avellon's opinion about whether a Quickclip allows a user to confirm that it is closed or Rasty's opinion about the force it takes to disengage a Quickclip. The district court ruled that Avellon's opinion that the tree stand was defective should not be allowed because of inconsistencies in his testimony. The district court explained that Avellon "opined [in his report] that the tree stand was defectively designed because there was no way to verify if the Quickclip was properly fastened before a user begins to ascend a tree" but had contradicted himself in his deposition by testifying that a user can tell whether a Quickclip is properly installed by looking at it or feeling if it is properly closed. The district court excluded Rasty's

causation opinion because, unlike Rasty, Primal Vantage's expert testified that a load would make a difference in the force it would take to release a Quickclip. The district court also discounted Rasty's testimony by saying it contradicted Rappuhn's testimony that he had checked that the tree stand was latched before he began climbing.

After excluding this proposed expert testimony, the district court granted summary judgment for Primal Vantage, concluding there was no genuine dispute of material fact. The district court based its conclusion on the idea that, without expert testimony, Rappuhn could not establish that his injuries would have been eliminated or reduced with an alternative design. The district court also concluded that Rappuhn's proposed alternative design was insufficient to meet his burden because it was susceptible to user error. Rappuhn appealed.

**II.**

We review a district court's exclusion of expert testimony for an abuse of discretion. *See Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1291 (11th Cir. 2005) (citing *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999)). "A district court abuses its discretion if it applies an incorrect legal standard, follows improper procedures in making the determination, or makes findings of fact that are clearly erroneous." *Klay v. United Healthgroup, Inc.*, 376 F.3d 1092, 1096 (11th Cir. 2004) (quoting *Martin v. Automobili Lamborghini Exclusive, Inc.*, 307 F.3d 1332, 1336 (11th Cir. 2002)). When reviewing a district court's ruling on the admission of expert testimony, "we defer to

the district court's ruling unless it is manifestly erroneous." *Rink*, 400 F.3d at 1291 (cleaned up).

We review summary judgment rulings *de novo*, "applying the same legal standards that bound the district court." *Seamon v. Remington Arms Co.*, 813 F.3d 983, 987 (11th Cir. 2016) (citing *Nat'l Fire Ins. Co. of Hartford v. Fortune Constr. Co.*, 320 F.3d 1260, 1267 (11th Cir. 2003)). "Motions for summary judgment should be granted only when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Id.* at 987–88 (citing Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

## III.

Rappuhn argues that the district court applied an incorrect legal standard in excluding portions of the experts' testimony and that this error infected its summary judgment decision. We agree. We address these two issues in turn.

### A.

We will start with the district court's decision to disregard Avellon's and Rasty's testimony. Federal Rule of Evidence 702 governs the admissibility of expert testimony. An expert witness may testify if (a) "the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue"; (b) "the testimony is based on

sufficient facts or data"; (c) "the testimony is the product of reliable principles and methods"; and (d) the expert reliably applied the principles and methods to the case's facts. Fed. R. Evid. 702. Under Rule 702, district courts play a "gatekeeping" role in the admission of expert testimony. *Daubert*, 509 U.S. at 597. District courts must consider whether "the expert is qualified to testify competently" about the matter he intends to address, whether "the methodology by which the expert reaches his conclusions is sufficiently reliable," and whether "the testimony assists the trier of fact . . . to understand the evidence or to determine a fact in issue." *City of Tuscaloosa v. Harcros Chems., Inc.*, 158 F.3d 548, 562 (11th Cir. 1998). To evaluate reliability, a district court applies the *Daubert* standard, considering (1) "whether the expert's theory can be and has been tested," (2) "whether the theory has been subjected to peer review and publication," (3) "the known or potential rate of error of the particular scientific technique," and (4) "whether the technique is generally accepted in the scientific community." *McCorvey v. Baxter Healthcare Corp.*, 298 F.3d 1253, 1256 (11th Cir. 2002) (citing *Daubert*, 509 U.S. at 593–94).

Although the basis for the district court's evidentiary rulings is not clear, we believe the district court concluded that Rappuhn's proposed expert testimony was unreliable under *Daubert*. The district court did not cite Federal Rule of Evidence 702, *Daubert*, or any of our case law laying out the standard for expert testimony admissibility. But the district court's reasoning tracks most closely with an assessment of reliability. The district court did not, for example, suggest that either Avellon or Rasty was unqualified as an

expert; nor did the district court question whether Avellon's or Rasty's testimony would be useful for the jury. Accordingly, we will evaluate the district court's reasoning as concerning the reliability of Avellon's and Rasty's proposed expert testimony.

We'll turn first to Avellon. The district court excluded Avellon's design testimony because of ostensibly conflicting statements in his testimony and expert report. The district court explained that Avellon "opined [in his report] that the tree stand was defectively designed because there was no way to verify if the Quickclip was properly fastened before a user begins to ascend a tree." But, according to the district court, Avellon contradicted himself during his deposition when he testified that a user can tell whether a Quickclip is properly installed by looking at it or feeling if it is properly closed. Because Avellon's testimony was purportedly contrary to his report, the district court ruled that Avellon's opinion that the tree stand was defective should not be allowed.

The district court was wrong to exclude this testimony for two reasons.

First, Avellon's statements are not, in fact, inconsistent. During his deposition, Avellon testified that a user could "*visually*" detect whether a Quickclip was "properly closed" by looking at it. But Avellon's expert report says that "[a]s designed, there are no *mechanical* means or warnings provided to assure the Quick Clip is properly fastened before a user begins to ascend a tree." Avellon's statement that a user could look at a Quickclip and determine it is "properly closed" (in the sense that the loop is fully around the rod)

does not conflict with his statement that the Quickclip doesn't feature any type of physical means to ensure it is "locked in position" or a mechanical means or warning to know that it is not "properly fastened" (in the sense of being fully engaged and unable to pop open). We have previously held that a district court manifestly erred when it mischaracterized an expert's opinion. *Seamon*, 813 F.3d at 991. That error occurred here too.

Second, even if there were some kind of inconsistency between the report and deposition testimony, we could not say that it undermines the admissibility of Avellon's testimony. The inquiry under *Daubert* is not whether the expert's assessment is incontrovertible. "*Daubert* does not require that a party who proffers expert testimony carry the burden of proving to the judge that the expert's assessment of the situation is correct." *Ruiz-Troche v. Pepsi Cola of Puerto Rico Bottling Co.*, 161 F.3d 77, 85 (1st Cir. 1998). The reliability inquiry is about the principles and methods the expert used, not whether the expert has provided credible testimony. *See* Fed. R. Evid. 702; *Daubert*, 509 U.S. at 590; *McCorvey*, 298 F.3d at 1256. Instead of excluding an expert's testimony entirely, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof" remain the preferred "means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596. Even if a jury could find some inconsistency between Avellon's report and his deposition that might undermine his testimony at trial, that credibility question is one for the jury to answer.

The district court made the same kind of errors in its assessment of Rasty's testimony. The district court excluded Rasty's causation testimony in part because Primal Vantage's expert testified that a user weight load would make a difference in the force it would take to release a Quickclip, meaning—in the district court's view—Rasty's opinion was not credible because he didn't perform his test on the tree stand with a user weight load. Based on these findings, the district court concluded that Rasty's testimony was unreliable.

This analysis—crediting one expert over another—misapplies *Daubert* and intrudes on the province of the jury. We have held that "a district court may not exclude an expert because it believes one expert is more persuasive than another expert." *Rink*, 400 F.3d at 1293 n.7. In opposition to the view of the defendant's expert, Rasty explained in his deposition why testing with a user weight load didn't matter and wouldn't have changed his opinion. The comparison of the testing done by Rasty and the defendant's expert goes to credibility, not reliability. As we've explained, "objections to the inadequacies of a study are more appropriately considered" as "going to the weight of the evidence rather than its admissibility." *Rosenfeld v. Oceania Cruises, Inc.*, 654 F.3d 1190, 1193 (11th Cir. 2011) (quoting *Hemmings v. Tidyman's Inc.*, 285 F.3d 1174, 1188 (9th Cir. 2002)) (citing *Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd.*, 326 F.3d 1333, 1345 (11th Cir. 2003)). Typically, the "failure to include variables" in an expert's testing "will affect the analysis'[s] probativeness, not its admissibility." *Quiet Tech. DC-8, Inc.*, 326 F.3d at 1346 (quoting *Bazemore v. Friday*, 478 U.S. 385, 400 (1986)).

The district court committed the same error when it discounted the weight of Rasty's testimony on the ground that it contradicted Rappuhn's testimony that the tree stand was latched when he started climbing. There may, or may not, be some inconsistency between Rappuhn's recollection of what he saw and what Rasty believes caused the accident. But a district court cannot limit an expert's testimony or grant summary judgment by crediting one witness over another.

In failing to follow well-established law, the district court abused its discretion. As we have explained, "[t]o faithfully discharge its gatekeeping duty," the district court "must engage in a rigorous" analysis. *United States v. Barton*, 909 F.3d 1323, 1331 (11th Cir. 2018). We cannot say that the district court's reasons for excluding this expert testimony reflects rigorous analysis. Neither Avellon's nor Rasty's testimony should have been excluded for the reasons the district court gave.

*B.*

We'll turn now to the district court's summary judgment decision. The district court concluded that there was no genuine dispute of material fact as to defective design and causation, which led to summary judgment on the Alabama Extended Manufacturer's Liability Doctrine, negligence, and wantonness claims. Rappuhn argues that the district court's summary judgment decision was erroneous in several respects. We will address two.

First, the district court's summary judgment was based on its decision to exclude the expert testimony that would have

created a genuine dispute of material fact. We need not perform the full summary judgment analysis ourselves. It is enough to say that the summary judgment was in error because it was based on the district court's abuse of discretion in excluding this testimony.

Second, we agree with Rappuhn that the district court also erred in analyzing his proposed alternative design. The district court suggested that, even if there were substantial evidence of causation, Rappuhn cannot establish that his injuries would have been eliminated or reduced with an alternative design unless that alternative design is resistant to all user error. The district court was incorrect. To prove a safer alternative design under Alabama law, a plaintiff must establish that (1) his injuries would have been eliminated or in some way reduced by the alternative design and (2) the utility of the alternative design outweighed the utility of the design actually used. *See Hosford v. BRK Brands, Inc.*, 223 So. 3d 199, 203 (Ala. 2016). One way Rappuhn could meet his burden under the first element is by establishing that an alternative design—such as his proposed nut-and-bolt design—has a *lower* risk of user error and device failure such that his injury wouldn't have occurred if it had been used. *See Gen. Motors Corp. v. Edwards*, 482 So. 2d 1176, 1189 (Ala. 1985) ("The critical question is whether, under all of the surrounding circumstances, a manufacturer has created an unreasonable risk of increasing the harm in the event of the statistically inevitable collision." (quoting *Curtis v. Gen. Motors Corp.*, 649 F.2d 808, 812 (10th Cir. 1981))), *overruled on other grounds by Schwartz v. Volvo N. Am. Corp.*, 554 So. 2d 927 (Ala. 1989), *as recognized in Haddan v. Norfolk S. Ry. Co.*, 367 So. 3d 1067 (Ala. 2022).

## IV.

We **REVERSE** and **REMAND** for further proceedings consistent with this opinion.